FILED
APR 29 2016
DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of County of Santa Clara
BY _____, DEPUTY
Robert Gutierrez

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

Farbod Dinyari,

    Petitioner,

vs.

Katayoon Farokhzadi,

    Respondent

Case No. 2010-1-FL-154481

TENTATIVE DECISION

Commencing on February 8, 2016, the above-entitled matter came on for trial in Department 13 before the Honorable James L. Stoelker. Attorney Camilla D. Cochran represented petitioner Farbod Dinyari. Attorney Richard A. Kutche represented respondent Katayoon Farrokhzadi. Attorney Peter M. Rehon represented claimant and joined party Namvar Dinyari. Evidence having been presented, the parties briefed and argued the matter. The case was taken under submission on April 4. Therefore, the court issues its tentative decision as follows:

Respondent Katayoon Farrokhzadi [hereinafter "Katayoon"] brought this action stating causes of action for declaratory relief, civil conspiracy, conversion, fraud, and injunctive relief against petitioner Farbod Dinyari [hereinafter "Farbod"] and Namvar Dinyari [hereinafter

EXHIBIT "D"

"Namvar"]. Katayoon alleges that Farbod breached his fiduciary duty to her by engaging in undisclosed financial transactions related to the business of Dinyari Construction, Inc. Farbod intentionally allowed Dinyari Construction to fail for the purpose of starting a new community property business Bay Quality Construction, Inc. In addition, Namvar, Farbod's father, conspired with Farbod to commit fraud and breach of duty by engaging in the undisclosed transactions. These failures to disclose were to the prejudice of Katayoon and caused her harm and financial damages.

The court finds that Katayoon failed to provide substantial credible evidence to support her causes of action for declaratory relief, civil conspiracy, conversion, fraud, or breach of fiduciary duty and, therefore, failed to meet her burden of proof.

Katayoon and Farbod were married on September 1, 1994. The corporation known as Dinyari Construction, Inc. was formed in January, 1999 and was owned in equal shares by Katayoon and Farbod. That business performed construction and roofing contracts. It was understood from the outset that Farbod would have primary, if not exclusive, responsibility for operating the business. As a practical matter over the history of the company, at least up to 2008, Farbod did operate the company without the participation of Katayoon. Although Katayoon was listed as corporate secretary, received a weekly salary of $5,250 and had a company car, she expressed no particular interest in the operations of the business. She consistently described herself as a "homemaker and stay at home mom".

Apparently unknown to Katayoon, Farbod would from time to time borrow significant amounts of cash from Namvar as operating expenses for the business. Prior to 2009, Farbod seldom discussed the financial condition of the business with Katayoon. Farbod did not disclose that he was requiring the assistance of his father. On the other hand, Katayoon knew that Namvar and his wife Shirin were financially involved in her non-business life. Namvar and Shirin paid for Katayoon's wedding reception, provided rent-free occupancy at their property in Freedom for seven years, and allowed Katayoon to collect and keep the rents from the cottage located on the property. On one occasion, Katayoon discovered that a house on which she and Farbod had made a purchased offer was the subject of a higher successful offer by Namvar –

presumably to be made a gift to them. Reportedly, Katayoon was uncomfortable with these financial benefits. She claims to have wanted complete financial independence from her in-laws. However, this demonstrated generosity might have been a subtle hint to Katayoon that Namvar and Shirin were inclined to be financially involved in their son's life.

There is no dispute that beginning in 1999 there is a long and documented history of loan transactions between Namvar and Farbod and/or Dinyari Construction. While it is possible that Katayoon was not made aware of these loans when they were made, this lack of knowledge did not cause her damage. The loans from Namvar were intended to preserve Dinyari, Inc. – the community property interest of Farbod and Katayoon. Ultimately, the unsecured loans were not repaid by Dinyari, Inc., were discharged in the Farbod Chapter 7 bankruptcy, and they became the equivalent of "gifts" from Namvar to Dinyari, Inc.

In 2009, the financial relationship between Namvar and Dinyari became chaotic. Farbod was scrambling to do whatever was necessary to keep his company solvent. Unfortunately, those efforts often involved cash from Namvar. All told, Namvar invested nearly $2,210,000 into Dinyari, Inc. which he did not recover. It is clear that Namvar did not invite or welcome Farbod's requests for financial support. In fact, these loans to Dinyari, Inc. were clearly a financial disaster for Namvar – profiting him nothing.

Katayoon suggests that Farbod breached his fiduciary duty to her by not allowing the business to go under sooner. If this is her argument, it fails in logic because the assets of the business provided significant financial support to the family for several years. If that income had stopped sooner, it would have meant the earlier collapse of the whole house of cars. There is no evidence that earlier notice of the precarious circumstances either would have allowed Katayoon to jump into the fray and rescue the sinking company or given her an opportunity to mitigate the losses to save other assets.

Similarly, Katayoon has not met her burden establishing that Namvar owed her a fiduciary duty to keep her fully informed of all of his financial transactions on behalf of Dinyari, Inc. The term "enmeshed" is not significant to support the existence of a partnership, joint venture or confidential relationship.

As to Farbod, the evidence shows that each party had equal management and control of the community property assets. Neither party took unfair advantage of the other. There is no evidence that Farbod misused or concealed company funds or received some benefit from the company not shared with Katayoon. Some of these transactions may have been initially unknown to Katayoon. However, there is no convincing evidence that Farbod actively concealed those transactions. It is apparent that each partner during the marriage fulfilled a certain role. Farbod operated Dinyari, Inc. and Katayoon managed the real estate investments, oversaw the household and cared for the children. The evidence gives the impression that Katayoon, by choice, preferred to remain ignorant about the financial turmoil which was occurring around her. She intended to maintain her lifestyle and to draw cash out of the failing business. It was not until Farbod began to invade the family assets such as their real estate investments that Katayoon was forced to pay attention. This attention became critical when Farbod and Katayoon separated in June, 2009 and Katayoon started to worry about the safety of her community property assets.

Those transactions beginning in 2008 were known to Katayoon or, with a little investigation prompted by the information actually known, could have been fully known. For example, in April, 2008, Katayoon executed deeds of trust on their three investment properties as collateral for two Rabobank loans. Katayoon contends that she was coerced into the Rabobank transaction because Farbod was threatening to kill himself as a result of financial pressure. Clearly, this dire threat should have alerted Katayoon to the seriousness of Dinyari. Inc.'s condition and encouraged her to directly intervene – if she was interested. In addition, in April, 2009 Katayoon signed a guaranty in favor of Ford Wholesale. She now complains that she only saw one page and did not have a chance to read the rest of the documents. She did as she was instructed by Farbod. However, she was not unaware of these transactions. She voluntarily elected not to fully review the nature of the transaction. In fact, in February, 2009, Katayoon was told that Namvar had guaranteed loans from Rabobank.

Katayoon became actively involved in Dinyari, Inc. for the first time in 2008. Then, she would visit the office and review the company's books and records. These visits would become more frequent in early 2009. On occasion, she would be accompanied by "advisors". In short,

there is no evidence that anyone prevented Katayoon from reviewing any records she wanted to see at Dinyari, Inc. Nothing material was hidden from her. Under oath, Katayoon has stated that she "always had the ability to review payments made and income deposited into our joint business account, and to withdraw funds from our joint business accounts to pay all our real estate business ventures and personal living expenses." In addition, Katayoon has declared that she "gave personal guarantees to various lenders of the company to finance upcoming and existing projects". She had complete access to checking accounts with the right to sign checks and to withdraw funds.

There is substantial evidence indicating that Katayoon was aware of the income tax refunds. The return amount was deposited into the Chase Bank joint account by Farbod. Katayoon acknowledged receiving the amount by removing exactly one-half in the form of a cashiers' check dated April 27, 2011.

Farbod is accused of opening a secret account at Bank of America for the purpose of hiding Dinyari, Inc. income from Katayoon. However, the evidence supports that the opening this account was motivated by Katayoon's raid on the business account to which she was an authorized signer. She removed funds intended by Sabine Jakobs to be used to pay vendors. As best could be determined, these funds were, in fact, used for a legitimate business purpose and, except for small amount reserved to pay attorney fees, Farbod used none of the amounts for his own personal purposes.

Katayoon contends that she was caused loss or damage because Farbod's and Namvar's financial machinations resulted in the loss of the community property real estate investment in four properties. However, the evidence reflects that the direct cause of the loss of the properties was a security interest voluntarily provided to Rabobank in the form of a Stipulated Judgment executed by Katayoon. Apparently, this stipulation was executed upon advice of counsel. This event demonstrates both the extent of Katayoon's knowledge of the financial predicament and her willingness to do those things necessary to save Dinyari, Inc.

Statements made by Katayoon under oath indicate that in February, 2009 Farbod had disclosed that he had borrowed money from his father and that Namvar had executed guarantees

for Rabobank loans. In February, 2009, Namvar made one last loan to Dinyari, Inc. in the amount of $710,000. At that time, he showed Katayoon copies of all the checks he had written to Dinyari, Inc. in the past and the uncashed checks for partial repayment. Similarly, Katayoon was told by Shirin in March, 2009 that Namvar had made loans to Dinyari, Inc.

The evidence clearly shows that at all times after separation in April, 2009, the financial affairs of Dinyari, Inc. were transparent. After Farbod filed for divorce on April 27, 2010, the information provided to Katayoon became more formalized. Aggressive and constant participation by knowledgeable counsel assured that every move by the business was closely monitored. Access to the books and records became part of stipulations and court orders. A great deal of the financial records were transmitted through counsel requests and responses. However, the conclusion remains that Katayoon was not deprived of access to any information from 2008 going forward.

In June, 2012, Dinyari, Inc. closed because it was unable to pay its workers compensation premiums. This conclusion had followed lawsuits by several creditors and vendors terminating credit arrangements. There is no persuasive evidence suggesting that the termination of Dinyari Construction was orchestrated as a fraud or as an excuse to re-start under a new name. Rather, the evidence adequately demonstrates that Dinyari Construction struggled and survived much longer than it reasonably should have. In fact, had it not been for the intervention of Namvar, it would have expired long prior to 2012. Katayoon was not harmed by the actions of Farbod and Namvar. On the contrary, her community property received a significant – if only temporary – benefit.

Bay Quality Construction was formed in May, 2012 and began operation in June, 2012. Farbod is 100 percent owner but the company is a community property asset of Farbod and Katayoon. Namvar is not now nor has he ever been an owner, shareholder, officer, director or employee of Bay Quality. There is no evidence that Bay Quality has at any time competed with Dinyari, Inc. which was inoperable prior to the beginning of Bay Quality. There is some question whether Namvar is an authorized signer on BCI bank accounts. However, there is no

evidence that Namvar has used that authority, if it exists, on behalf of BCI or in his own self-interest.

As Dinyari, Inc. was suffering its death knell, Namvar did exercise his legal rights under security agreements including those acquired from Rabobank. Those legal rights were exercised with the assistance and direction of counsel. There is nothing inappropriate about the foreclosure on this security. Katayoon, through her counsel, was aware of Namvar's intention to initiate foreclosure. After taking constructive possession of the collateral, Namvar elected to lease the operable equipment to Bay Quality Construction rather than liquidate the amount for a small fraction of its value. This decision was not prejudicial to Katayoon's interests. Ultimately, Bay Quality has not made good on its lease payment obligations to Namvar. However, whatever savings Bay Quality has enjoyed by not paying Namvar has inured to the benefit of the value of Katayoon's community property share of the new company. Namvar has no present security interest in Bay Quality.

Katayoon has failed to meet her burden of proof that Farbod and/or Namvar are liable for breach of fiduciary duty, fraud, conversion or conspiracy or that any actions of Farbod or Namvar caused her damage. The court reserves the issue of attorney fees and costs.

The matter is remanded so that date of valuation shall be determined by a hearing in the Family Law Court.

This tentative decision is provided pursuant to CRC 3.1590 (c),(4) and it will become the statement of decision unless, within 10 days of service, a request for statement of decision is made by a party.

Dated: 4-29-16

Hon. James L. Stoelker
Superior Court Judge

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SANTA CLARA |  |
|---|---|
| Petitioner:<br>Farbod Dinyari | |
| Respondent:<br>Katayoon Farokhzadi | |
| **PROOF OF SERVICE BY MAIL OF:**<br>TENTATIVE DECISION | **Case Number:**<br>2010-1-FL-154481 |

CLERK'S CERTIFICATE OF SERVICE: I certify that I am not a party to this case and that a true copy of this document was mailed first class, postage fully prepaid, in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on : April 29, 2016

David H. Yamasaki, Chief Executive Officer/Clerk

BY _Robert Gutierrez_, Deputy

---

Camilla D. Cochran
Law Offices of Camilla D. Cochran
10 Almaden Boulevard, Suite 1250
San Jose, CA  95113

Richard A. Kutche
Attorney at Law
1500 East Hamilton Ave. Ste 118
Campbell, CA  95008-0400

Peter M. Rehon
Rehon & Roberts
A Professional Corporation
830 The Alameda
San Jose, CA  95126

Proof of service
Clerk's Certificate of Service